THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:

DATED: October 05, 2009



Honorable Pamela Pepper
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

---

IN RE:    GORDON RAY WARD and      Case No. 08-26106-pp
    LISA MARIE WARD,

                 Chapter 7
         Debtors.

---

GANTHER CONSTRUCTION, INC.,      Adv. Case No. 08-2242

         Plaintiff,

v.

GORDON RAY WARD,

         Defendant.

---

**MEMORANDUM DECISION AND ORDER FINDING IN FAVOR
OF DEFENDANT GORDON WARD, AND DISMISSING
ADVERSARY COMPLAINT**

---

Defendant Gordon Ray Ward filed for Chapter 7 bankruptcy protection,

and listed among his creditors plaintiff Ganther Construction, Inc. The

plaintiff filed an adversary complaint, asking this Court to find that the

1

defendant's debt to the plaintiff was nondischargeable under 11 U.S.C. §523(a)(4), because the defendant incurred the debt as a result of fraud or defalcation while acting in a fiduciary capacity, or as a result of embezzlement or larceny. Specifically, the plaintiff alleged that the defendant incurred the debt through the commission of "theft by contractor," in violation of Wis. Stat. §779.02(5). The parties have tried the case, and based on the evidence presented at that trial, the Court concludes that the plaintiff failed to meet its burden to prove, by a preponderance of the evidence, the three elements of a claim under §523(a)(4). Accordingly, for the reasons that follow, the Court finds in favor of defendant Gordon Ward, and dismisses this adversary complaint.

I.    FACTUAL BACKGROUND

ANDEV Group, LLC, a real estate and health care development concern, had begun work on an Alzheimer's/assisted living facility in Menomonee Falls, Wisconsin called Northfield Manor. Also involved, either in the ownership or operation of Northfield Manor, was Health Care REIT, Inc., an equity real estate investment trust that invests in senior housing and health care real estate. (Trial Rec. 9:46:40 - 10:03:33.)[1] The plaintiff, Ganther Construction, is a Wisconsin general contracting firm engaged in commercial and institutional

_____

[1] As the Court will discuss in more detail in Part III(B)(1) below, there was some confusion at trial regarding whether the owner of the project was ANDEV or Health Care REIT, Inc. (Trial Rec. 9:46:40 - 10:03:33.)

building construction; Benjamin Ganther is the owner. ANDEV and/or Health Care REIT retained the plaintiff as the prime contractor for Northfield Manor. The plaintiff subcontracted some of the work to other companies; specific to these proceedings, the plaintiff hired Ward Builders, owned by defendant Gordon Ray Ward, to perform rough carpentry and other miscellaneous work.

As a condition of Ward Builders' participation as a subcontractor in the Northfield Manor project, the plaintiff required Ward Builders to obtain a letter of credit. (Ex. 101.) On September 14, 2006, AnchorBank FSB issued such an instrument to Ward Builders, and the plaintiff was one of the beneficiaries of the letter. (Ex. 101.) The letter of credit stated that it would expire at the close of business at 12:00 AM Central Time on March 14, 2007. Id.

During the time it worked on the Northfield Manor project, the plaintiff billed ANDEV every 30 days for all costs (including profit, materials and labor) incurred by the plaintiff and its subcontractors. (Trial Rec. 9:13:55 - 9:15:55.) In turn, ANDEV would cut a check to the plaintiff, and the plaintiff then would distribute to its various subcontractors the portions of those funds to which they were entitled, based upon invoices the subcontractors had submitted. (Trial Rec. 9:13:55 - 9:15:55.) In order to receive their payments, the subcontractors had to sign lien waivers. (Ex. 1 - 4.) The money that the plaintiff used to make the distributions came directly from ANDEV. (Trial Rec. 9:46:40, May 7, 2009.)

Ward Builders provided materials and labor totaling approximately

$400,000 for the Northfield Manor project.  It submitted invoices for those amounts to the plaintiff, and the plaintiff paid those invoices in full. (Trial Rec. 9:12:21, 9:13:55-9:15:55.)  Specific to this action, on September 18, 2006, Ward Builders sent the plaintiff invoice #201888. (Ex. 6.)   That invoice requested payment of $161,065.68 for labor and materials through September 30, 2006.  The invoice broke out labor costs of $75,000 and material costs of $86,065.68.  Id.  In addition, the invoice specified costs for two change-orders–"Change Order #1-Materials" at $6,800 and "Change Order #2-Materials (steel flat straps)" at $3,264.  Id. The typewritten instructions on invoice #201888 directed the plaintiff to "pay material charges direct to" Richardson Lumber Co. ("Richardson"), and listed a due date of October 10, 2006.  Id.  This notation makes clear–and the defendant did not contest–that the materials for which Ward Builders invoiced the plaintiff in invoice #201888 were provided by Richardson.  Immediately to the right of these typewritten instructions, however, was a handwritten notation that read, "no–paying Ward directly."  Id.

The plaintiff paid Ward Builders the total amount demanded in invoice #201888.  (Ex. 6 & 7.)  Specifically, on October 17, 2006, the plaintiff issued check #48287 in the amount of $153,012.40, made payable to Ward Builders Incorporated.  (Ex. 7.)  In exchange, on that same date, Ward Builders signed a lien waiver for the $153,012.40; the lien waiver contains the handwritten notation, "Invoice 201888."  (Ex. 1.)  Some 45 days later, on November 30, 2006, the plaintiff issued check #48614 in the amount of $8,803.28, made

4

payable to Ward Builders Incorporated. (Ex. 6.) On the same day, Ward Builders signed a lien waiver for that sum; again, the waiver bears the handwritten notation, "Invoice 201100 . . . 201888." (Ex. 3.)

Although the plaintiff paid Ward Builders in full for invoice #201888, Ward Builders did not, in turn, pay Richardson. When Richardson failed to receive payment for some of the materials it had provided to Ward Builders, Richardson demanded payment from the plaintiff. (Trial Rec. 9:28:58.) Richardson threatened to put a contractor's lien on the Northfield Manor project if the plaintiff did not pay. (Trial Rec. 9:28:58.) By this time, the letter of credit that AnchorBank had issued to Ward Builders had expired, so the plaintiff could not access that credit to pay Richardson. Faced with the threatened imposition of a contractor's lien, the plaintiff decided to pay Richardson itself via a series of installments. (Trial Rec. 9:28:58.)

On June 7, 2007, Richardson and the plaintiff reached an agreement on payment terms. (Ex. 10.) The plaintiff agreed to pay Richardson a total of $60,972 by means of three installments. (Ex. 10.) The first installment of $33,000 was due by June 13, 2007. (Ex. 10.) The second installment of $9,500 was due by June 30, 2007. (Ex. 10.) The final installment of $18,472 was due by July 20, 2007. (Ex. 10.) In return for these three payments, Richardson agreed to provide a letter to Health Care REIT which would rescind Richardson's letter of intent to file a construction lien on the property. (Ex. 10.) Additionally, Richardson signed a statement agreeing that it had

5

furnished materials to Ward Builders worth $60,972, and that it had not been paid for those materials. (Ex. 10; Trial Rec. 9:28:58-9:33:55.)

The plaintiff paid Richardson in full under the June 7, 2007, agreement. (Ex. 10-17.) Shortly thereafter, Ward Builders filed for bankruptcy,[2] and the defendant individually filed for bankruptcy, along with his spouse[3].

II.  JURISDICTION

This Court has jurisdiction over the instant proceeding because, pursuant to 28 U.S.C. §§157(b)(2)(A) and (I), it is a "core proceeding" which "arises under" Title 11 of the United States Code. *See also*, 28 U.S.C. §1334(a).

III.  ANALYSIS

The plaintiff has alleged that while it paid Ward Builders in full for the building materials used in the Northfield Manor, Ward Builders failed to use those funds to pay subcontractor Richardson in full for building materials it had provided, and that this failure constituted a violation of Wis. Stat. §779.02(5). The plaintiff argued that after it paid Ward Builders for the materials Richardson had provided, it paid Richardson directly from its own

---

[2] Ward Builders, Inc. filed for Chapter 7 protection on February 5, 2008. *See* docket no. 08-20906. The trustee has determined that there are assets available in that proceeding, and is in the process of pursuing and resolving certain claims. The plaintiff in this matter also is listed as a creditor in that proceeding.

[3] The defendant and his wife filed their Chapter 7 petition on June 4, 2008. *See* docket no. 08-26106. This Court issued the order of discharge in that underlying matter on September 25, 2008.

6

funds to prevent Richardson from filing a construction lien, thereby paying twice for the same materials. The plaintiff asserted that because this conduct constituted theft by contractor pursuant to Wis. Stat. §779.02(5), the debt is nondischargeable pursuant to 11 U.S.C. §523(a)(4). And because the defendant owned Ward Builders, the plaintiff argued that under §779.02(5), the defendant was personally liable for the violation, and therefore that the plaintiff's debt in the defendant's individual bankruptcy is nondischargeable.

The defendant responded that the plaintiff did not receive money from the *owner* of the Northfield Manor project. Rather, he argued that the plaintiff received money from ANDEV, whom he characterized as the *operator* of the project. Accordingly, he argued that Wis. Stat.§ 779.02(5) does not apply. In the alternative, he claimed that even if ANDEV was the owner of the project, the plaintiff could not trace the money that ANDEV provided the plaintiff directly to Ward Builders. Finally, he argued that he, in his individual capacity, could not be held personally liable to the plaintiff under Wis. Stat. §779.02(5).

The Court finds that while the plaintiff met its burden of proof as to the first two elements of the theft-by-contractor statute, it did not meet its burden as to the final element–it did not prove that the defendant committed "fraud or defalcation" while acting in his fiduciary capacity.

Case 08-02242-pp    Doc 16    Filed 10/05/09    Page 7 of 22

A. The Plaintiff Bears the Burden of Proving, By a Preponderance of the Evidence, that the Debt the Defendant Incurred is Nondischargeable Pursuant to § 523(a)(4).

Section 523(a)(4) of the Bankruptcy Code states in pertinent part:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

11 U.S.C. §523(a)(4) (2004). The Seventh Circuit has held that the creditor bears the burden of proving a debt nondischargeable, and the quantum of proof required is a preponderance of the evidence. *See* Matter of Bero, 110 F.3d 462, 465 (7th Cir. 1997), citing Grogan v. Garner, 498 U.S. 279, 287 (1991). Courts must construe exceptions to discharge strictly against the creditor. Id. at 465; Matter of Scarlata, 979 F.2d 521, 524 (7th Cir. 1992) (citations omitted).

B. The Plaintiff Has Not Proven All Three of the Elements of §523(a)(4) By A Preponderance of the Evidence.

There are three elements that the plaintiff must prove by a preponderance of the evidence in order to prove a §523(a)(4) nondischargeability claim: 1) that a trust existed; 2) that the defendant was a fiduciary of that trust; and 3) that the defendant committed "fraud or defalcation" while acting as a fiduciary of the trust. Chase Lumber & Fuel Co. v. Koch (In re Koch), 197 B.R. 654, 656 (Bankr. W.D. Wis. 1996); *see also*, In re Eisenberg, 189 B.R. 725, 730 (Bankr. E.D. Wis. 1995).

8

1.    *The Plaintiff Has Proven That a Trust Existed.*

"Although the definition of 'fiduciary' in [the] context [of a nondischargeability proceeding] is a narrowly defined question of federal law, bankruptcy courts look to state law to determine whether the requisite trust relationship exists." Fischer Constr., LLC and Team Fischer, Inc. V. Ecker (In re Ecker), 400 B.R. 669, 671-72 (Bankr. E.D. Wis. 2009), citing In re Bowles, 318 B.R. 129, 138 (Bankr. E.D. Wis. 2004). Thus, this Court must look to Wisconsin law to determine whether a trust existed.

The plaintiff points the Court to Wisconsin's theft-by-contractor statute in support of its assertion that a trust existed. That statute, Wis. Stat. §779.02(5), states in relevant part:

> [A]ll moneys paid to any prime contractor or subcontractor by any owner for improvements, *constitute a trust fund* only in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor and materials used for the improvements, until all the claims have been paid. . . .

§779.02(5) (emphasis added). The statute expressly states that when an owner pays money to a prime or subcontractor for improvements, the money constitutes a trust fund in the hands of that prime or subcontractor. The beneficiaries of such trusts are the "laborers, suppliers and materialmen," as well as "owners and contractors." *See*, Matter of Thomas, 729 F.2d 502, 506 (7th Cir. 1984). In order to determine whether a trust existed in the case at bar, therefore, the Court must determine whether (1) an owner (2) paid monies

9

(3) to a prime or subcontractor (4) for improvements.

The facts support a finding that the last three of those four requirements for a trust exist. The facts adduced at trial demonstrated that ANDEV provided funds to the plaintiff (the prime contractor) for the Northfield Manor project. The plaintiff, in turn, paid $161,065.68 of those funds, via checks 48287 and 48615, to Ward Builders (a subcontractor) for invoice#201888. Invoice #201888 specified that $76,001.68 of that amount was for "materials," which the defendant (the subcontractor) used to perform the rough carpentry (improvements).

SO–money was paid (by ANDEV) to a subcontractor (the defendant) through the conduit of the plaintiff (the prime contractor) for materials used for "improvements" to the Northfield Manor project. *See* Kramer Bros. Inc. v. Pulaski State Bank, 406 N.W.2d 379, 383 (Wis. 1987) ("Typically the prime contractor serves as a conduit for payments from an owner to a subcontractor.") This chain of events shows the existence of the last three of the four factors necessary to prove the existence of a "a trust fund" under Wis. Stat. §779.02(5).

At trial, however, the defendant argued that ANDEV was not the "owner" of the Northfield Manor project, but merely was an "operator." The defendant argued that §779.02(5) states that a trust is created only when an "owner" pays monies to a prime or subcontractor for improvements, and that if ANDEV was not the "owner" of the Northfield Manor project, then its payment of monies to

10

a prime or subcontractor for materials provided by a supplier would not create a trust. In other words, the defendant argued that the plaintiff had not proven the first of the four trust requirements.

The Wisconsin Supreme Court has rejected this argument. In <u>Wis. Dairies Coop. v. Citizens Bank & Trust</u>, 467 N.W.2d 124, 128 (Wis. 1991), the court held that "[s]ection 779.02(5), Stats., requires payment, *but not direct payment*, from the owner to the contractor." (Emphasis added) The court explained that "[t]o require direct payment from the owner to the contractor for a trust to be established undermines the protection the legislature intended to provide to subcontractors and owners through the statute." <u>Id.</u> at 127-128. Given this holding, the defendant's argument fails.

It is true that the evidence at trial was a bit murky regarding ANDEV's role in the Northfield Manor project. Benjamin Ganther, the owner of the plaintiff, testified that the plaintiff received payments from ANDEV, and that ANDEV was the operator and owner of the Northfield Manor project. (Trial Rec. 9:46:40.) When the defendant raised questions about an entity called Health Care REIT, Inc. (whose name apparently appeared in some of the documentation on the project), Ganther reiterated that he believed that the money his company received from ANDEV came from the "owner" of the project, because ANDEV and Health Care REIT were "intertwined."

Confusion on this topic is understandable. A REIT–a real-estate investment trust–is

Case 08-02242-pp    Doc 16    Filed 10/05/09    Page 11 of 22

> [a] company that invests in and manages a portfolio of real estate, with the majority of the trust's income distributed to its shareholders. Such a trust may qualify for special income-tax treatment if it distributes 95% of its income to its shareholders.

BLACK'S LAW DICTIONARY 1292 (8th ed. 2004).

Thus, a REIT is an investment entity that either invests in real estate or lends money to developers or owners to do so. If an entity meets the qualifications to be a REIT, it gets special treatment under the Internal Revenue Code. REITs must invest a certain percentage of their income in real estate, must generate a certain percentage of their revenue from real estate, and must pay a high percentage of their taxable income to shareholders on an annual basis. Health Care REIT, Inc. is an equity REIT, which means that it takes some sort of ownership position in the real estate in which it invests (as opposed to a mortgage REIT, which purchases, owns and manages mortgage loans, but not the real estate itself).

The plaintiff did not present any evidence regarding the relationship between ANDEV Group, LLC and Health Care REIT, Inc., other than Mr. Ganther's testimony that the two entities were "intertwined." Given the definition of a REIT, there are three possibilities–either (1) only Health Care REIT, and not ANDEV, was an investor in–and, thus, an owner of–of Northfield Manor, and ANDEV only managed the development, or (2) Health Care REIT and ANDEV both were investors, and therefore both were owners of the development, or (3) Health Care REIT lent money to ANDEV, and only ANDEV

12

was an owner. Given the Wisconsin Supreme Court's holding in <u>Wisconsin Dairies Coop.</u>, and the stated policy underlying the creation of the trust, which of those possibilities was the reality is irrelevant.

If Health Care REIT was the owner of the Northfield Manor project, then it paid monies to the plaintiff through its manager, ANDEV. If both entities jointly owned the development, then ANDEV, as one of the owners, paid monies to the plaintiff. If ANDEV was an owner of the project, which it purchased using investment funds provided by Health Care REIT, then it, as owner, paid monies to the plaintiff. Under any of these scenarios, money made its way from the owner or owners of the development to a general contractor, and then to a prime contractor, to pay for improvements.

Accordingly, the Court finds that the plaintiff has proven the existence of a trust under Wis. Stat. §779.02(5).

2. *The Plaintiff Has Proven That the Defendant was a Fiduciary of That Trust.*

The second element that the plaintiff must prove to support its claim of theft by contractor is the fiduciary element–it must prove that the defendant in this case was a "fiduciary" of the above-discussed trust. The Court concludes that the plaintiff has proven this element.

In his decision in <u>Chase Lumber & Fuel Co.</u>, Judge Martin noted that Wis. Stat. §779.02(5) "creates an express fiduciary relationship." <u>Chase Lumber & Fuel, Co.</u>, 197 B.R. at 658. He referred to the Wisconsin Supreme Court's

Case 08-02242-pp    Doc 16    Filed 10/05/09    Page 13 of 22

decision in <u>Kramer Bros., Inc. v. Pulaski State Bank</u>, 406 N.W.2d at 383, which discussed the fiduciary role the statute creates for prime contractors and subcontractors. In <u>Kramer Bros.</u>, the Wisconsin Supreme Court explained, "[A]s long as payments can be traced from the owner to the subcontractor the monies in the hands of the subcontractor are held in trust under the statute for the benefit of the second-tier subcontractors. This interpretation of the statute comports with the practices of the industry." <u>Id.</u> at 383. The court further pointed out the reason for the creation of the fiduciary relationship, stating that "the policy of the statute . . . is to assist subcontractors and their subcontractors and suppliers in getting paid and to protect owners and prime contractors from paying twice." <u>Id.</u>

Thus, if one can trace payments from the owner of the project to the subcontractor, and if there are "second-tier" subcontractors or suppliers to be paid out of those payments, then the subcontractor is a "fiduciary" within the meaning of the statute. In this case, if the plaintiff proved that payments went from ANDEV (the owner or the owner's manager) to Ward Builders (the subcontractor), and if some of those payments were for materials provided by a second-tier supplier, then Ward Builders was, in fact, a fiduciary of the trust discussed in Part B(1) above.

Contrary to the defendant's arguments at trial, the Court was able to trace payments from the owner to the subcontractor. The plaintiff proved at trial that it issued check #48287 in the amount of $153,012.40, made payable

Case 08-02242-pp    Doc 16    Filed 10/05/09    Page 14 of 22

to Ward Builders Incorporated. (Ex. 7.) Approximately 45 days later, on November 30, 2006, the plaintiff issued check #48614 in the amount of $8,803.28, made payable to Ward Builders Incorporated. (Ex. 6.) Finally, the plaintiff proved that the money for these payments came from ANDEV, Trial Rec. 9:13:55-9:15:55, whom, as the Court discussed above, either was an owner of the project or a manager paying the funds on behalf of an owner. Nothing about the evidence indicated that Ward Builders did not receive the funds, or that the money went to some other party. Money went from ANDEV to the plaintiff to Ward Builders.

Similarly, the evidence at trial demonstrated that some of that money was supposed to pay Richardson, a second-tier supplier, for materials. As discussed above, on September 18, 2006, Ward Builders sent the plaintiff invoice #201888. (Ex. 6.) Typewritten instructions on that invoice directed the plaintiff to "pay material charges direct to" Richardson Lumber Co. ("Richardson"), and listed a due date of October 10, 2006. Id. This notation makes clear that Richardson was the second-tier supplier of the materials for which Ward Builders invoiced the plaintiff in invoice #201888. While it appears that originally Ward Builders intended the plaintiff to pay Richardson directly for those materials, someone added to the invoice a handwritten notation which changed those directions; that notation read, "no–paying Ward directly." Id. Accordingly, as discussed above, the plaintiff paid the costs of the Richardson materials directly to the defendant. Once those funds landed

15

in the hands of Ward Builders, Ward Builders became a "fiduciary," who was obligated to hold those funds in "trust" until Richardson was paid in full.

At trial, the defendant attempted to attack the proof on this element by arguing that it was Ward Builders, and not the defendant in his individual capacity, which was the "fiduciary" of the "trust" the held funds to pay Richardson, and therefore that the defendant, in his individual capacity, could not be subject to a nondischargeability action under §523(a)(4). The statute itself puts paid to this argument. Wis. Stat. §779.02(5) states in relevant part that "[if the prime contractor or subcontractor is a corporation, such misappropriation also shall be deemed theft by any officers, directors or agents of the corporation responsible for the misappropriation." Wis. Stat. §779.02(5). *See also*, Romes Design, Inc. v. Dinkins (In re Dinkins), 327 B.R.918, 923 (Bankr. E.D. Wis. 2005) ("If an individual debtor is an officer, director, or agent responsible for misappropriation by an entity, the debt will be excepted from the discharge of the individual.") Ward Builders, Inc. is a corporation, and the defendant is an officer, director or agent of that corporation (and was at the time of the events involved in this case). Thus, he was a fiduciary of the trust in the same way that his corporation, Ward Builders, was a fiduciary of the trust.[4]

---

[4] Wisconsin cases also explain that an officer or director is personally liable for violations of §779.02(5) regardless of whether that officer or director personally benefitted from the misapplied trust funds. *See, e.g.*, Burmeister Woodwork Co., Inc. v. Friedel, 222 N.W.2d 647, 650 (Wis. 1974); Capen

16

3. *The Plaintiff Has Not Proven That the Defendant Committed "Fraud or Defalcation" While Acting as a Fiduciary of the Trust.*

The remaining element which the plaintiff must prove in order to sustain its claim under §523(a)(4) is the element of "fraud" or "defalcation." In <u>In re Dinkins</u>, a case involving a dischargeability objection under §523(a)(4), one of this Court's colleagues held that "[n]o wrongful intent is required for a finding of nondischargeability. It is only necessary for the plaintiff to prove that funds received from the owner should have been paid to a beneficiary of the statutory trust, and [that] the debtor failed to do so." <u>In re Dinkins</u>, 327 B.R. at 923. The same court reiterated that holding in <u>In re Ecker</u>, 400 B.R. at 673. This holding comports with "[t]he state and federal decisions involving breaches of duty under Wis. Stat. §779.02(5) and its analog, Wis. Stat. §779.16," which "appear to rely on something akin to strict liability." <u>Chase Lumber & Fuel Co.</u>, 197 B.R. at 657, citing <u>Capen Wholesale, Inc. v. Probst</u>, 509 N.W.2d 120, 124 (Wis. Ct. App. 1993); <u>In re Berg</u>, 172 B.R. 894, 896 (Bankr. E.D. Wis. 1994); <u>Matter of Thomas</u>, 729 F.2d at 505-506; <u>In re Lotto</u>, 21 B.R. 767, 770-71 (Bankr. E.D. Wis. 1982).

In 1994, however, the Seventh Circuit Court of Appeals decided <u>Meyer v.</u>

---

<u>Wholesale, Inc. v. Probst</u>, 509 N.W.2d 120, 124-125 (Wis. Ct. App. 1993). The defendant here did not argue that he received no benefit from the misapplied funds, or that that fact relieved him of the duties of a fiduciary; rather, he argued simply that his company, not he, was the fiduciary. Again, this argument fails under the specific language of the theft-by-contractor statute states.

17

Rigdon, 36 F.3d 1375 (7th Cir. 1994). Meyer involved a claim that a debt was nondischargeable under §523(a)(11), because the debt arose from an act of "fraud or defalcation while acting in a fiduciary capacity committed with respect to [a] depository institution or credit union." Id. at 1378. Defendant Rigdon argued that the plaintiff had alleged only that he was negligent, and that "mere acts of negligence are not 'defalcations.'" Id. at 1382. Thus, the Seventh Circuit took up the question of what a plaintiff must prove in order to prove "defalcation," as that term is used in the Bankruptcy Code.

The court began by noting that "'defalcation' is not defined in the Bankruptcy Code," and that the legislative history of §523(a)(11) did not provide any guidance on that issue. Id. The court found, however, that "the term 'defalcation' ha[d] been used in the Bankruptcy Code since 1841," and therefore that it could "assume that Congress intended to give the term 'defalcation,' as it is used in section 523(a)(11), the same meaning that courts have given it in interpreting other provisions of the Bankruptcy Code." Id. at 1382-83, citing Central Hanover Bank & Trust Co. v. Herbst, 93 F.2d 510, 511 (2d Cir.1937).

After conducting an exhaustive review of cases interpreting the word "defalcation" (in both the §523(a)4 and §523(a)(11) contexts), the Seventh Circuit reached the following conclusion:

> a mere negligent breach of a fiduciary duty is not a "defalcation" under section 523(a)(11). "It is a well recognized principle in bankruptcy law that exceptions to discharge are strictly construed

18

against the objecting creditor and in favor of the debtor. This is based on the strong policy of the Bankruptcy Code of providing a debtor with a 'fresh start.' " *In re Marvin*, 139 B.R. 202, 205 (Bankr. E.D. Wis.1992) (citing *Gleason v. Ihaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915)). Given this well-recognized principle, and the split of authority concerning whether a "defalcation" may result from negligence, we cannot say that Congress intended for a debt arising from a mere negligent breach of fiduciary duty to be excepted from discharge under section 523(a)(11).

Id. at 1385.

Two years after the Seventh Circuit decided Meyer, the bankruptcy court for the Western District of Wisconsin decided Chase Lumber & Fuel Co. v. Koch.  Chase Lumber involved a §523(a)(4) nondischargeability claim in which the plaintiff alleged that the defendant had breached the §779.02(5) fiduciary duty.  Chase Lumber & Fuel Co., 197 B.R. at 656.  Judge Martin noted that while past decisions "ha[d] generally failed to address the precise issue of the fiduciary's standard of care," they had for the most part treated violations the §779.02(5) trust *per se* defalcation.  Id.

Judge Martin concluded, however, that after the Seventh Circuit's decision in Meyer, the issue in "defalcation" cases was no longer whether the defendant failed to pay the trust beneficiary, but whether the defendant's failure to do so "entailed bad faith or affirmative misconduct rather than mere negligence or mistake."  Id. at 658.  He conceded that "*Meyer* is not precise" about the standard of care, "suggesting only that something akin to 'reckless' may be the appropriate standard."  Id. at 657.  Nonetheless, given the Meyers holding that mere negligent breach of a fiduciary duty does not constitute

19

"defalcation," Judge Martin found that a plaintiff asserting a §523(a)(4) claim had to prove, by a preponderance of the evidence, that more than mere negligence led to the fiduciary's failure to pay the beneficiary.  Id. at 658.

Accordingly, it is on this element that the Court finds that the plaintiff failed to sustain its burden of proof.  The plaintiff did not present any evidence demonstrating that the defendant's failure to pay Richardson was the result of something more than mere negligence.  Certainly, as Judge Martin discussed in Chase Lumber, §779.02(5) creates "an express fiduciary relationship," and "Wisconsin contractors are charged with knowledge of the law in this area."  Id. This Court even might be safe in inferring that someone like the defendant, with extensive construction experience, had actual knowledge of the §779.02(5) requirements and was well familiar with his duties under them.  But the plaintiff produced absolutely no proof that the defendant's failure to pay Richardson constituted a "more-than-negligent breach of fiduciary duty."  Id. at 659.  Without such evidence, the Court cannot conclude that the plaintiff proved, by a preponderance of the evidence, that the defendant committed "defalcation" while acting in his fiduciary capacity.[5]

_____

[5] "Defalcation" in a fiduciary capacity is not the only way a debtor may run afoul of §523(a)(4).  The section also excepts from discharge debts incurred when a debtor commits "fraud" in a fiduciary capacity, or debts arising from "embezzlement" or "larceny."  The Court has not addressed these alternative methods of violating  §523(a)(4), however, because each of these requires a plaintiff to prove some level of intent.  See, e.g., G.W. White & Son, Inc. v. Tripp (In re Tripp), 189 B.R. 29, 35 (Bankr. N.D.N.Y. 1995) ("Establishing fraud requires a showing of a positive intentional act involving moral turpitude,

Case 08-02242-pp   Doc 16   Filed 10/05/09   Page 20 of 22

At trial, the plaintiff argued that once it had demonstrated that the defendant received money according to the statutory trust, the burden of proof shifted to the defendant to demonstrate what he had done with the money. (Trial Rec. 9:09:25.) The plaintiff did not point the Court to any case law supporting this argument, however, and all of the cases the Court has found leave the burden of proof on all elements squarely on the plaintiff's shoulders. The plaintiff proved that the defendant's "actions . . . square[d] with those that the theft-by-contractor statute [was] designed to prevent," id. at 658, but not that those actions constituted "fraud or defalcation" under §523(a)(4).[6]

---

where as establishing defalcation merely requires a showing that the fiduciary failed to account for money received in his fiduciary capacity, even if through negligence") (citations omitted); O'Conner v. Booker (In re Booker), 165 B.R. 164, 171 (Bankr. M.D.N.C. 1994) ( "Under federal law, embezzlement requires three elements: ' "(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud."') (citations omitted); Werner v. Hofman (In re Hofman), 144 B.R. 459, 464 (Bankr. D.N.D. 1992), aff'd, 161 B.R. 998 (D.N.D. 1993), aff'd 5 F.3d 1170 (8th Cir. 1993) ("Larceny is the wrongful taking and carrying away of property of another with intent to convert said property to one's use without the consent of the owner") (citations omitted). If the plaintiff in this case failed to prove the lower standard of negligence, then obviously it did not prove intent.

[6] Because the Court concludes that the plaintiff has not met its burden of proving fraud or defalcation, the Court is not required to reach the defendant's argument that the plaintiff did not have to pay Richardson out of its own pocket because it could have drawn on the irrevocable standby letter of credit that Anchor Bank issued on September 14, 2006. (The plaintiff failed to draw on that letter of credit before it expired on March 14, 2007, and counsel for the plaintiff argued at trial that this was due to an error on behalf of an employee of the plaintiff, who had lost his job as a result of the error.) The Court notes, however, that it found this argument irrelevant to the question of §523(a)(4) nondischargeability. The fact that the plaintiff might have mitigated

Case 08-02242-pp    Doc 16    Filed 10/05/09    Page 21 of 22

IV.    <u>CONCLUSION</u>

Because the plaintiff failed to prove by a preponderance of the evidence the third element of its §523(a)(4) claim, the Court hereby **FINDS** in favor of the **DEFENDANT**, Gordon Ray Ward, and **ORDERS** that this adversary complaint is hereby **DISMISSED**.

#   #   #   #   #

---

its losses, and thus shifted the debt from the hands of the plaintiff to the hands of someone else (Anchor Bank, presumably) does not somehow make the debt dischargeable.

Case 08-02242-pp    Doc 16    Filed 10/05/09    Page 22 of 22